**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JENNIFER WILMOTH,

      Plaintiff,

      v.

ARPIN AMERICA MOVING SYSTEMS, LLC d/b/a ARPIN AMERICA NEW JERSEY, *et al.*,

      Defendants.

No. 19cv19187 (EP) (CLW)

**OPINION**

**PADIN**, **District Judge.**

Plaintiff Jennifer Wilmoth ("Wilmoth") allegedly endured sexual harassment and sex-based discrimination throughout her employment at Relocation Express, LLC ("Relocation Express") and brings suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII") and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12 *et seq.* ("NJLAD"). Defendants Relocation Express and Mario Silvestri ("Silvestri") (collectively, "Defendants"), now move for summary judgment. D.E. 97-1 ("Motion" or "Mot."); D.E. 97-3 ("Br."). The Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78; L.Civ.R.78.1(b). Because an issue of fact remains as to the hostile work environment claim, the Court will **GRANT in part** and **DENY in part** Defendants' Motion.

## I.    BACKGROUND[1]

### A.    The Parties

Wilmoth is a former Relocation Express employee.  Defs. Facts ¶ 1.  Relocation Express

is a moving and storage company that provides professional moving services.  *Id.* ¶ 2.  Defendant

Silvestri was, at all relevant times, an owner of Relocation Express.  *Id.* ¶ 3.  Wilmoth's checks

were issued by Relocation Express, which did business as Arpin America.  Pl. Supp. Facts ¶ 11

(citing Deposition of Jennifer Wilmoth ("Wilmoth Dep.") 41:23-42:5).  Wilmoth was told that

Relocation Express was a subsidiary of Arpin.  *Id.* ¶ 12 (citing Wilmoth Dep. 42:10-43:6).

John Cianflone ("Cianflone") was Relocation Express's General Manager.  Defs. Facts ¶

4.[2]  He was also the Vice President of one of the Arpin entities.  Pl. Supp. Facts ¶ 39 (citing Wilmoth

Dep. 85:4-20).  Cianflone is alleged to have sexually harassed Wilmoth from 2017 until early 2019,

including through sexual discussions and advances.  Defs. Facts ¶¶ 11, 62.  The parties disagree

---

[1] The facts are drawn from Defendants' Statement of Undisputed Material Facts, D.E. 97-2 ("Defs. Facts"); Plaintiff's Responsive Statement of Undisputed Material Facts, D.E. 99 ("Pl. Facts"); and Plaintiff's Counter-Statement of Disputed Facts, D.E. 99 ("Pl. Supp. Facts").  "Federal Rule of Civil Procedure 56.1(c)(1) provides that a party asserting a fact is (or cannot be) genuinely disputed must support the assertion by (A) 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials' or (B) 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'"  *Dor v. TD Bank*, No. 21-18955, 2023 WL 9017558, at *9 (D.N.J. Dec. 29, 2023) (quoting Fed. R. Civ. P. 56(c)(1)).  Additionally, Local Civil Rule 56.1(a) states that where parties opposing summary judgment disagree with the movant's statement of material facts, "they must indicate 'each material fact in dispute and cit[e] to the affidavits and other documents submitted in connection with the motion.'"  *Id.*  Both parties' briefs and statements of facts repeatedly refer to the record as "replete" with evidence in their favor but fail to cite to the record.  Facts unsupported by citations to the record are not considered.  Lastly, Local Civil Rule 56.1(a) states that "[t]he movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers."  Defendants did not.

[2] Plaintiff disputes that Cianflone was served in this case by stating that Plaintiff sent Cianflone a waiver of service that was never returned.  Pl. Facts ¶ 4.

on which Defendants remain in this case. *Id.* ¶ 5; Pl. Facts ¶ 5.[3]  For the Court's purposes, "[t]he remaining *active* defendants in the case are Relocation Express, LLC and Mario Silvestri."  D.E. 46 (emphasis added).[4]

### B.    Wilmoth's Employment at Relocation Express

Wilmoth was hired in or around October 2017 to work as Relocation Express's Operations Manager for its Edison, New Jersey warehouse.  Defs. Facts ¶ 6.  Wilmoth's initial salary was $62,000. *Id.* ¶ 9.  Wilmoth worked directly for Cianflone, the then-General Manager of Relocation Express.  *Id.* ¶ 7.  Her working hours varied based on need.  *Id.* ¶ 10.  Wilmoth's duties included dispatching drivers; handling administrative work such as paperwork, billing, and setting appointments; overseeing the warehouse; and working with surveyors.  *Id.* ¶ 8 (citing Wilmoth Dep. 23:3-9; Deposition of Mario Silvestri ("Silvestri Dep.") 20:8-12).[5]  At least two supervisors

---

[3] The relationship between "Arpin America Moving Systems, LLC d/b/a Arpin America New Jersey, Relocation Express, LLC, [and] Relocation Express – Arpin LLC" is not clear, Pl. Facts ¶ 5, and neither party cites to the record to clarify as much.  "Judges are not like pigs, hunting for truffles buried in the record." *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (cleaned up).

[4] No other defendants have appeared in the case, and Arpin America Moving Systems, LLC ("AAMS") and Relocation Express – Arpin LLC "are the actual Arpin parties in default."  D.E. 34.  Defendant Cianflone's location is "unknown" to the Court.  D.E. 33.  The Court further ordered that "American moving systems; Cianflone; and Relocation express will be defaulted by plaintiff."  D.E. 46.  The parties were also ordered to "stipulate Arpin America Moving and Relocation express/Arpin LLC out of case by October 7, 2022," but no such stipulation was ever executed.  D.E. 64.

[5] Wilmoth purportedly disputes Defs. Facts ¶ 8, but only responds to the first sentence.  As "failure to reference evidence of record demonstrates that there is no reason to disbelieve the statements of fact contained in the Paragraphs at Issue," *McCann v. Unum Provident*, 921 F. Supp. 2d 353, 359 (D.N.J. 2013), the Court deems facts undisputed where Wilmoth fails to address them at all.  "[A]ny statement, or portion thereof, that is not clearly denied-in *substance,* not merely with the label 'disputed'-and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted." *Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, No. 12-3427, 2014 WL 268652, at *1 n.1 (D.N.J. Jan. 23, 2014).

employed by "Arpin" came to help in the warehouse.  Pl. Supp. Facts ¶ 20 (citing Wilmoth Dep. 52:14-53:1).

### C.    The Parties Dispute Wilmoth's Performance

#### 1.  *Defendants' version*

Beginning in or around Summer 2018, Relocation Express had serious operational issues that threatened the business.  Defs. Facts ¶ 13 (citing Silvestri Dep. 26:1-12).  Wilmoth was made aware of these operational failures, *id.* ¶ 14 (citing Wilmoth Dep. 97:1-10), and she and Cianflone were jointly held responsible.  *Id.* ¶ 15 (citing Wilmoth Dep. 70:10-13, 19-25; 71:1-3).  Wilmoth did not complain to Defendant Silvestri about Cianflone's conduct at this time.  *Id.* ¶ 17 (citing Wilmoth Dep. 155:19-22; 180:25-181:3; 183:23-184:2); Silvestri Dep. 31:5-8, 158).

#### 2.  *Wilmoth's version*

While Defendant Silvestri blamed both Wilmoth and Cianflone for failures at the warehouse, Defendant Silvestri testified that "[Cianflone] was the general manager and the buck stops there[.]"  Pl. Facts ¶ 15 (citing Silvestri Dep. 27:4-8).  Wilmoth's performance was "fine." *Id.* (citing Silvestri Dep. 24:13-25:11).  Defendant Silvestri also considered Wilmoth qualified for the position.  *Id.* (citing Silvestri Dep. 18:17-19:2).  Defendant Silvestri replaced Cianflone due to Cianflone's failures.  *Id.* (citing Silvestri Dep. 46:13-47:2).  Cianflone's management also accounted for Wilmoth's perceived performance issues.  *Id.* (citing Wilmoth Dep. 71:4-18). Although Wilmoth did not complain to Defendant Silvestri about Cianflone's conduct at this time, *id.* ¶ 17, it was due to her fear that the two were friends.  *Id.* (citing Wilmoth Dep. 120:11-17). Wilmoth experienced depression and anxiety as a result of Cianflone's misconduct. *Id.* ¶ 13 (citing Wilmoth Dep. 57:7-25).  Cianflone's conduct affected her performance at Relocation Express.  Pl. Supp. Facts ¶ 33 (citing Wilmoth Dep. 73:14-17).

Wilmoth was never given the chance to do the job she was hired to do.  Pl. Facts ¶ 13 (citing Wilmoth Dep. 102:9-103:3).  Wilmoth was told by Cianflone that the reason it took so long for her to be onboarded was because Defendant Silvestri did not think it was a good idea to hire a woman to do the job and doubted her capabilities.  Pl. Supp. Facts ¶ 30 (citing Wilmoth Dep. 66:12-23).  Defendant Silvestri himself told Wilmoth he was reluctant to hire her.  *Id.* ¶ 31 (citing Wilmoth Dep. 67:18-25).

### D.    James Essex Replaces Wilmoth

Wilmoth was notified that her position was being restructured on October 30, 2018.  Defs. Facts ¶ 24.  The letter stated, in part:

> This letter is to inform you of changes to your employment at Relocation Express, LLC. As you are aware, there were several major operational failures that occurred during the past several months and which have had a significant financial impact on Relocation Express.
>
> Because of the nature of the failures, Relocation Express has hired a new Operations Manager who will begin employment on October 30, 2018. As a result of the new hire, your title will no longer be Operations Manager.
>
> The new Operations Manager will be reassigning your duties within the coming weeks. Along with the reassignment of duties your compensation will be modified to reflect the new position.

*Id.*

James Essex ("Essex") was hired as the new Operations Manager.  *Id.* ¶ 26.  At the time Essex was hired, Defendant Silvestri was unaware of any sexual harassment claims by Wilmoth against Cianflone.  *Id.* ¶ 23.  Wilmoth's compensation was not lowered when Essex was hired and she never received a new title despite her title as "Operations Manager" being temporarily removed.  *Id.* ¶ 26.  The parties dispute how Wilmoth's job otherwise changed.  Defendants state, without a citation to the record, that Wilmoth's schedule did not change and her responsibilities

generally remained the same. *Id.* Wilmoth states that her schedule varied—sometimes working more hours, sometimes less—and that she had to teach Essex how to do his job. Pl. Facts ¶ 26 (citing Wilmoth Dep. 125:11-126:5). Essex was terminated in or around January 2019, and Wilmoth's title as Operations Manager was reinstated. Defs. Facts ¶¶ 27-28.

The parties also dispute *why* Essex was hired. Defendants state that Essex took Wilmoth's position to fix operational failures at Relocation Express. *Id.* ¶ 19 (citing Wilmoth Dep. 70-73). Wilmoth states she was replaced by Essex because she rejected Cianflone's unwelcome sexual advances. Pl. Facts ¶ 19 (citing Wilmoth Dep. 107:6-18).

### E. Wilmoth Reports Sexual Harassment by Her Supervisor, John Cianflone

Wilmoth alleges she was sexually harassed by Cianflone from 2017 until early 2019. Defs. Facts ¶ 11. Wilmoth rejected Cianflone's advances and complained to Cianflone repeatedly during this time. *Id.* ¶ 12. She complained about Cianflone's conduct to another supervisor, Essex, in or around the end of 2018. *Id.* Essex responded that it was obvious Cianflone had romantic feelings towards Wilmoth based on his behavior towards her. Pl. Supp. Facts ¶ 56 (citing Wilmoth Dep. 153:12-24). Wilmoth believed that Essex would escalate her complaints. *Id.* ¶ 59 (citing Wilmoth Dep. 158:7-17). She had not complained to Defendant Silvestri at this point because she was afraid of him. *Id.* ¶ 60 (citing Wilmoth Dep. 159:4-13).

In January 2019, Wilmoth complained by e-mail about Cianflone to Defendant Silvestri, detailing Cianflone's inappropriate behavior and its impact on Wilmoth. Defs. Facts ¶¶ 31-32.[6] Wilmoth felt she had no choice but to escalate the complaints to Defendant Silvestri after Cianflone's misconduct did not cease, despite her complaints to both Cianflone and Essex. Pl.

---

[6] Defendants state that "Plaintiff never brought any specific issue regarding Cianflone's behavior to the attention of the company." Defs. Facts ¶ 40. This is contradicted by Defendants themselves.

Supp. Facts ¶ 66 (citing Wilmoth Dep. 179:5-11).  After receiving the e-mail, Defendant Silvestri raised the issue to Michael Langley ("Langley"), controller for Relocation Express, who was responsible for payroll, banking, and human resources-related matters.  Defs. Facts ¶ 34.

Defendant Silvestri and Langley then jointly called Wilmoth to discuss her allegations.  *Id.* On the call, Wilmoth reiterated the allegations set forth in her e-mail.  *Id.* ¶ 35.  Defendant Silvestri then called Cianflone to discuss the allegations and advised him he could no longer be alone with Wilmoth at any time, nor communicate with her on a personal basis.  *Id.* ¶ 36.  Cianflone was also told his office hours would be cut back to minimize his in-office days.  *Id.*  Cianflone denied the allegations but agreed to comply with Defendant Silvestri's orders.  *Id.*  Defendant Silvestri updated Wilmoth and asked whether she wanted Cianflone out of the office entirely, to which she said no.  *Id.* ¶ 37.

In roughly January 2019, Defendant Silvestri replaced Cianflone as General Manager with Joseph Stephenson ("Stephenson").  *Id.* ¶ 29.  But, on March 15, 2019, Wilmoth emailed Defendant Silvestri again complaining about Cianflone's misconduct.  Pl. Supp. Facts ¶ 72 (citing Ex. E to Certification of Marguerite Kneisser ("Kneisser Cert.")).

**F.     The Parties Dispute the Events Following Wilmoth's Report**

*1.  Defendants' version*

After Wilmoth reported Cianflone's behavior to Defendant Silvestri, Cianflone stopped sexually harassing her, touching her, and making inappropriate comments to her.  Defs. Facts ¶ 38 (citing Wilmoth Dep. 185:8-24).  Cianflone continued to call Wilmoth about solely work-related issues and Wilmoth e-mailed Defendant Silvestri on March 15, 2019 stating, in part:

> I understand we are to go to Joe for everything which is fine I have no problem with that at all. Please advise John to do the same. I don't need him calling me every morning before Joe arrives or watching me on the cameras harassing me about what I am doing or who I am

> talking to. Joann and I have no problem speaking or working with Joe.[7]

*Id.* ¶ 39 (citing Ex. E to Kneisser Cert.).

Wilmoth also stopped reporting to Cianflone when Stephenson was hired to replace him. *Id.* ¶ 41 (citing Wilmoth Dep. 34:9-16; 188:18-23).  After Essex and Stephenson were hired, Wilmoth's relationship with Defendant Silvestri improved.  *Id.* ¶ 43 (citing Wilmoth Dep. 110:5-25).

### 2.  *Wilmoth's version*

Wilmoth had to continue working with Cianflone despite reporting his behavior to Defendant Silvestri.  Pl. Facts ¶ 38 (citing Wilmoth Dep. 184:23-25).  Cianflone was angry with Wilmoth after she reported his behavior and asked Wilmoth if she was trying to ruin him.  *Id.* (citing Wilmoth Dep. 185:10-11; 187:3-11).  He told her that if he was going down, she was going down with him.  Pl. Supp. Facts ¶ 46 (citing Wilmoth Dep. 94:7-10).  Moreover, the harassment continued as Cianflone constantly hovered over Wilmoth, called her, and told her he was watching her.  Pl. Facts ¶ 38 (citing Wilmoth Dep. 186:12-20).  Cianflone also made comments about how he liked Wilmoth's hair and the color of her nails.  *Id.* (citing Wilmoth Dep. 185:12-24).  He additionally continued to call Wilmoth pet names such as "dear" or "darling" after his behavior was reported, though less than before.  Pl. Supp. Facts ¶ 18 (citing Wilmoth Dep. 51:17-21).  Cianflone's calls to Wilmoth following the report were not limited to work-related issues.  Pl. Facts ¶ 39 (citing *id.* ¶ 38).

Wilmoth stopped reporting to Cianflone after Stephenson was hired to replace him, but only after Wilmoth made another complaint to Defendant Silvestri about Cianflone's conduct.  *Id.*

---

[7] The parties do not dispute the existence or contents of this e-mail.

¶ 41 (citing Wilmoth Dep. 188:18-24).  Although Cianflone's harassment stopped at this point, Defendants began retaliating against Wilmoth.  *Id.* ¶ 42 (citing *id.* ¶ 35 (citing Wilmoth Dep. 183:3-21)).  Right after reporting Cianflone's misconduct to Defendant Silvestri, Wilmoth was treated differently.  Pl. Supp. Facts ¶ 68 (citing Wilmoth Dep. 184:6-17).  Stephenson also acted like he did not like Wilmoth and made comments about her complaints.  *Id.* ¶ 77 (citing Wilmoth Dep. 213:17-24).  In March 2019, Wilmoth also asked for sick days and was told she would not be paid, but in prior instances when she was sick, she was not told about any specific limitations.  *Id.* ¶ 74 (citing Wilmoth Dep. 195:18-25).

Additionally, Wilmoth did not feel respected by Defendant Silvestri.  Pl. Facts ¶ 43 (citing Wilmoth Dep. 109:8-15).  Defendant Silvestri spoke differently to male employees and female employees.  *Id.* (citing Wilmoth Dep. 109:16-110:5).  Although Wilmoth's relationship with Defendant Silvestri improved after Essex was hired, this was only because Cianflone was gone.  *Id.* (citing Wilmoth Dep. 110:8-22).

### G.   Wilmoth's Disciplinary Record

Wilmoth had a problem with tardiness while employed at Relocation Express.  Defs. Facts ¶ 45.  Wilmoth continued to report late for work despite warnings.  *Id.* ¶ 47.  She received a written warning notice from Stephenson on April 16, 2019.  *Id.* ¶ 48 (citing Ex. F to Kneisser Cert.).  The notice advised Wilmoth that her next violation would result in termination or suspension.  *Id.* Wilmoth had five documented late notices, including April 29, May 2, May 14, May 21, and May 29, 2019.  *Id.* ¶ 49. On July 16, 2019, Wilmoth received a final written warning noting issues with her job performance, including her lack of attentiveness to her work assignments and general duties.  *Id.* ¶ 50.  Wilmoth received another warning on July 18, 2019.  *Id.* ¶ 51.  Wilmoth remained employed by Relocation Express despite issues with tardiness and job performance.  *Id.* ¶ 52.

Wilmoth does not dispute that she received lateness warnings; however, she attributes her discipline to retaliatory animus. Pl. Facts ¶ 47 (citing Silvestri Dep. 96:20-97:5). On at least one occasion, she had approval from Stephenson to come to work late. *Id.* (citing Wilmoth Dep. 203:20-204:16; Ex. F to Kneisser Cert.). With respect to the July 18, 2019 warning, it was the workers who mixed up the labels causing the underlying issue, not Wilmoth. *Id.* ¶ 51 (citing Wilmoth Dep. 236:3-24). With respect to her tardiness, Wilmoth also understood that another employee was repeatedly late but was never written up by Stephenson. Pl. Supp. Facts ¶ 80 (citing Wilmoth Dep. 227:12-228:6).

**H.    Wilmoth's Furlough and Termination**

In March 2020, Relocation Express's business began to suffer due to the COVID-19 pandemic. Defs. Facts ¶ 53. The business was required to cease or limit its operations and business was substantially reduced overall. *Id.* Wilmoth, and all but two other Relocation Express employees, were furloughed at this time. *Id.* Cianflone was also laid off. *Id.* Wilmoth was notified by letter that she was being placed on furlough effective March 30, 2020. *Id.* ¶ 54.

Wilmoth was ultimately laid off, effective September 25, 2020. *Id.* ¶ 55. The parties dispute the reason for Wilmoth's termination. Defendants attribute her termination to the economic downturn in light of COVID-19. *Id.* Wilmoth attributes her termination to retaliation, as she was the only furloughed employee who was not brought back to work. Pl. Facts ¶ 55 (citing Wilmoth Dep. 219:8-220:6; Silvestri Dep. 105:14-16).

It is undisputed that no one was hired to replace Wilmoth as Operations Manager of Relocation Express. *Id.* ¶ 57. The position was absorbed by another employee, Danielle Amorosi, who became the Warehouse Manager, Operations Manager, and Dispatch Manager during and

after the pandemic.  *Id.*  Wilmoth began working at another company in or around August 2020.

Defs. Facts ¶ 56.

## I.        Wilmoth Files an EEOC Complaint

Wilmoth filed a complaint with the Equal Employment Opportunity Commission

("EEOC") on April 19, 2019, against Arpin America Moving Systems, LLC d/b/a Arpin America

New Jersey; Arpin Group, Inc.; Arpin Van Lines Inc.; Relocation Express, LLC; and Relocation

Express – Arpin LLC for sex/gender discrimination, sexual harassment, hostile work environment,

and retaliation.  *Id.* ¶ 58.

## II.      PROCEDURAL HISTORY

Defendants now move for summary judgment.  *See* Mot.  Wilmoth's Amended Complaint

alleges five causes of action: (1) gender discrimination under Title VII against corporate

defendants; (2) retaliation under Title VII against corporate defendants; (3) gender discrimination

and hostile work environment under NJLAD against all defendants; (4) retaliation under NJLAD

against all defendants; and (5) aiding and abetting violations of NJLAD against all defendants.

D.E. 9 ("Amended Complaint" or "Am. Compl.") ¶¶ 109-130.  Defendants seek summary

judgment on all five claims.  *See* Mot.  Plaintiff opposes.  D.E. 98 ("Opp'n").  Defendants reply.

D.E. 101 ("Reply").

## III.     LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury

could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d

Cir, 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is

"material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "primarily rely on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[.]" *Buxton v. Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Unsworn allegations in memoranda and pleadings or allegations questioning the credibility of witnesses are insufficient to defeat a properly supported summary judgment motion. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

IV.     **ANALYSIS**

A.      **Wilmoth Fails to Meet the Title VII Numerosity Requirement**

Defendants seek dismissal of the Title VII claims as a matter of law, arguing that Wilmoth has failed to establish that Defendant Relocation Express meets the numerosity threshold to be considered an employer under the statute (fifteen employees).  Br. at 5.

Title VII forbids employers to "'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325 (3d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).  Title VII applies only to qualifying "employers," defined as "'a person engaged in an industry affecting commerce who has *fifteen or more employees* for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.'"  *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 463 (D.N.J. 2016) (emphasis in original) (quoting 42 U.S.C. § 2000e(b)).  It is the plaintiff's burden to establish that her employer "had at least fifteen employees during the requisite time period."  *Id.*

Wilmoth argues that she was jointly employed by Relocation Express and the Arpin Defendants (AAMS and Arpin Group, Inc.), who in the aggregate employ more than fifteen people.  Opp'n at 5-6.  The Court agrees with Defendants.

A joint employment relationship exists when "two entities exercise significant control over the same employees."  *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2014) (cleaned up).  To assess an entity's control with another employer, district courts look to "(1) the entity's authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) its day-to-day supervision of

employees, including employee discipline; and (3) its control of employee records, including

payroll, insurance, taxes and the like." *Id.* (cleaned up).  "Determination of whether a defendant

is a 'joint employer' under Title VII requires careful consideration of <u>all</u> the circumstances

surrounding the work relationship,' and no one factor is dispositive." *Doe. v. McDonald's USA,*

*LLC*, 504 F. Supp. 3d 360, 366 (E.D. Pa. 2020) (quoting *Washington v. ABM Janitorial Servs.,* No.

11-6462, 2013 WL 6047494, at *4 (E.D. Pa. Nov. 15, 2013)).

 The only evidence in the record actually addressing the *number* of employees comes from

Defendants, who set forth that Relocation Express had approximately eight to nine employees for

each working day from January through October 2019.  Ex. 1 to Certification of Mario Silvestri

("Silvestri Cert.").  Wilmoth counters that "[t]he record is replete with evidence that would support

a reasonable juror concluding" that Relocation Express and AAMS were joint employers, Opp'n

at 7, but cites to no evidence in the record even showing how many employees AAMS had.

Instead, she cites to the record for evidence that the entities purportedly exercise joint control.  *See,*

*e.g., id.* (Defendant Silvestri acknowledged AAMS and Relocation Express were both owned by

M&P Map Family Limited Partnership (citing Silvestri Dep. 8:21-10:9; 14:18-16:6)); (Cianflone's

e-mail domain ended with @arpinamerica.com (citing Ex. C to Aff. of Zachary Holzberg));

(Langley controlled payroll, sick time, and HR functions (citing Silvestri Dep. 90:16-23, 108:6-

17)).

 This is not a case of premature motion practice in which the Court should permit discovery

into the number of employees.  *See O'Toole*, 203 F. Supp. 3d at 465.  The parties engaged in

thorough discovery.  Here, there is no evidence in the record that AAMS had the authority to hire

and fire employees, set conditions of employment, or promulgate work rules and assignments.

*Plaso*, 553 F. App'x at 205-06.  Nor is there evidence that it supervised employees on a day-to-day

basis and handled employee discipline. *Id.* at 205. At best, the evidence shows *some* control of employee records, as Langley handled payroll, *id.*, but this alone is not enough to find a joint employment relationship. Moreover, the record does not even reflect how many employees AAMS had during the relevant period. No reasonable jury could find that AAMS and Relocation Express were joint employers merely because they were owned by the same company, and the Relocation Express controller, Langley, controlled Wilmoth's payroll and sick time. Accordingly, as it is Plaintiff's burden to meet the Title VII numerosity threshold, *see O'Toole*, 203 F. Supp. 3d at 463, the Court will **DISMISS** Plaintiff's Title VII claims.

**B.      NJLAD[8] Sex-Based Discrimination May Proceed Against Relocation Express**

To state a claim for hostile work environment sexual harassment, a plaintiff must show that "the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*" *Lehmann*, 132 N.J. at 603-04 (alterations in original). "To hold an employer liable, the plaintiff must also establish a fifth element, *respondeat superior.*" *Tourtellotte v. Eli Lilly and Co.*, 636 F. App'x 831, 846 (3d Cir. 2016).

> **1.   *The Hostile Work Environment Claim Fails Against Defendant Silvestri as a Matter of Law Because He is Not an Employer***

Defendants first argue that there is no individual liability of supervisors for hostile work environments under the NJLAD, and thus the claim against Defendant Silvestri fails as a matter of law. Br. at 19. Rather than address this argument, Wilmoth merely points to Cianflone's alleged

---

[8] Though the Title VII claims will not proceed, the Court will still look to federal precedent governing Title VII in construing the NJLAD. *See Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 600 (1993).

discrimination and argues that Defendant Silvestri discriminated against Wilmoth.  Opp'n at 10.
The Court agrees with Defendants.  "N.J.S.A. 10:5–12a prohibits unlawful employment practices
or unlawful discrimination only by 'an employer.'  An individual supervisor is not defined as an
'employer' under the LAD."  *Herman v. Coastal Corp.*, 348 N.J. Super. 1, 24, 791 A.2d 238, 251
(N.J. Super. 2002) (citing N.J.S.A. 10:5–5e).  "Instead, individual liability of a supervisor for acts
of discrimination or for creating or maintaining a hostile environment can only arise through the
'aiding and abetting' mechanism that applies to 'any person.'"  *Cicchetti v. Morris Cnty. Sheriff's
Office*, 194 N.J. 563, 594 (2008) (citing N.J.S.A.10:5-12(e)).  Accordingly, the Court will
**DISMISS** Count III—hostile work environment under NJLAD—as to Defendant Silvestri.

> 2.  *The Hostile Work Environment Claim May Proceed Against Relocation
> Express*

Defendants appear to concede the first four elements of a hostile work environment claim
and only dispute the fifth: vicarious liability.  Br. at 20; *see Padula v. Clarks Summit State Hosp.*,
No. 19-2184, 2021 WL 4429089, at *12 (M.D. Pa. Sept. 27, 2021) ("Defendants argue that Plaintiff
has not shown she was denied benefits under the FMLA—element five. . . .  Because this is the
only argument raised in their brief, I find that for the purposes of this motion only, Defendants do
not dispute that Plaintiff has met her obligations under elements one through four.").

"[A]n employer whose supervisory employee is acting within the scope of his or her
employment will be liable for the supervisor's conduct in creating a hostile work environment."
*Lehmann*, 132 N.J. at 619.  Defendants first, in passing, argue that "the alleged harasser is the
victim's supervisor, and the harassment occurred outside the scope of employment[.]"  Br. at 20.
Defendants do not cite to any evidence supporting that the harassment occurred outside the scope
of employment.  Therefore, they have failed to meet their burden on summary judgment and are

not entitled to a finding that the conduct was outside the scope of employment.  *See Di Cosala v. Kay*, 91 N.J. 159, 169 (1982).[9]

There are two primary categories of claims against employers for sexual harassment committed by their employees: (1) "a direct cause of action against the employer for negligence or recklessness under *Restatement* § 219(2)(b)" and (2) "vicarious liability under *Restatement* § 219(2)(d)." *Aguas v. State*, 220 N.J. 494, 512 (2015).  Wilmoth seems to argue both.  Opp'n at 14.  Defendants' primary argument turns on whether an affirmative defense is available to its vicarious liability.  Br. at 21.

The New Jersey Supreme Court has clarified the burden-shifting framework that may afford an employer an affirmative defense to vicarious liability:

> In a hostile work environment sexual harassment case under the LAD in which the plaintiff alleges employer vicarious liability under *Restatement* § 219(2)(d), the plaintiff has the initial burden of presenting a prima facie hostile work environment claim. If no tangible employment action has been taken against the plaintiff, the defendant employer may assert the two-pronged affirmative defense of *Ellerth* and *Faragher*. To establish that defense, the defendant employer has the burden to prove, by a preponderance of the evidence, both prongs of the affirmative defense: first, that the employer exercised reasonable care to prevent and to correct promptly sexually harassing behavior; and second, that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

*Aguas*, 220 N.J. at 524.

Defendants argue that the record does not demonstrate any tangible employment action taken against Wilmoth.  Br. at 21.  Tangible employment decisions include, but are not limited to,

---

[9] The Court also notes that Defendants do not attempt to provide non-discriminatory explanations for the alleged harassment.  *See Williams v. Twp. of Lakewood*, No. 17-11401, 2020 WL 7391009, at *19 (D.N.J. Dec. 15, 2020).

"hiring and firing, promotion and failure to promote, demotion, undesirable reassignment, a decision causing a significant change in benefits, compensation decisions and work assignment, and suspension or other progressive discipline." *Aguas*, 220 N.J. at 526 (cleaned up). Wilmoth refers to "several" tangible employment actions, but only cites to the record for one: her October 2018 reassignment. *See* Opp'n at 13.

The parties do not dispute that Wilmoth's compensation was never lowered during her restructuring and her responsibilities remained generally the same. *See* Defs. Facts ¶ 26. Wilmoth states, disputed by Defendants, that her schedule varied, and that she sometimes worked more hours than before, and sometimes less. *See* Pl. Facts ¶ 26. She also notes she had to onboard her replacement. *Id.*

The Supreme Court recently addressed whether a reassignment constituted discrimination under Title VII. *See Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967 (2024). In *Muldrow*, the officer's transfer resulted in a less prestigious placement; fewer substantial responsibilities; a more irregular schedule, including weekend work; and the loss of a take-home car. *Id.* at 977. Nothing in the record here reflects changes rising to this level. Wilmoth's October 2018 title change therefore does not constitute adverse employment action.

Nonetheless, the absence of a tangible employment action is merely a threshold issue on the availability of the aforementioned affirmative defenses. Defendants still must establish by a preponderance of the evidence *both* that they "'exercised reasonable care to prevent and correct promptly any sexually harassing behavior" *and* "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Aguas*, 220 N.J. at 499 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). Defendants seemingly do not dispute the latter. Even so, the record is clear—and

undisputed by the parties—that Wilmoth took advantage of at least some corrective opportunities to avoid harm by reporting the alleged sexual harassment to Defendant Silvestri. Defs. Facts ¶ 33. Defendants note elsewhere in their brief—critically, not in the context of addressing the relevant prong of this test—that Wilmoth said no to Defendant Silvestri's question of whether she wanted Cianflone removed from the office completely. Br. at 8 (citing Silvestri Dep. 64-65). To the extent they mean to argue this constitutes Wilmoth's failure to take advantage of a corrective opportunity, they provide no other details around the conversation or offer. Accordingly, the Court will **DENY** summary judgment as to Count III against Relocation Express and the claim will survive.[10]

### C.     The Record Does Not Support Wilmoth's Retaliation Claim

To state a case for retaliation under the NJLAD, "a plaintiff must show that she (1) engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action." *Nuness v. Simon and Schuster, Inc.*, 221 F. Supp. 3d 596, 605 (D.N.J. 2016) (citing *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 287 (3d Cir. 2010)). Courts look to whether "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Tourtellotte*, 636 F. App'x at 852 (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)). "In assessing whether there is a causal connection, this Circuit has focused on the temporal proximity of the protected activity and the adverse employment action, as well as whether or not there is a pattern of antagonism." *Id.*

---

[10] As this Count will proceed, the Court need not address Wilmoth's alternative arguments for sex discrimination.

Defendants do not contest the first prong: that Wilmoth engaged in protected activity. They therefore concede this element. However, the Court independently finds that Wilmoth engaged in protected activity on multiple occasions. First, her filing of an EEOC complaint in April 2019 is protected activity. *See Hargrave v. Cnty. of Atlantic*, 262 F. Supp. 2d 393, 424 (D.N.J. 2003). Her informal complaints of sexual harassment to her supervisors are also considered protected activities. *See Speed v. WES Health Sys.*, 93 F. Supp. 3d 351, 357 (E.D. Pa. 2015). The parties do not dispute that Wilmoth reported Cianflone's alleged sexual harassment to Essex in December 2018, Defs. Facts ¶ 12, and to Defendant Silvestri in January 2019. *Id.* ¶ 33.

Turning to the second prong, Defendants argue that Wilmoth fails to prove any facts constituting an adverse employment action. Br. at 11. Where the party opposing summary judgment bears the ultimate burden of proof, the movant may discharge its initial burden by showing an absence of evidence to support the non-movant's case. *Player v. Motiva Enterprises, LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007). If a movant satisfies its initial burden by pointing to an absence of evidence, the nonmovant must, in opposition, identify evidence of record that creates a genuine issue of material fact. *Id.*

Despite pointing to numerous purported adverse actions in her Amended Complaint, Wilmoth, in opposition, only refers to the denial of paid sick leave and the selective enforcement of the lateness policy. Opp'n at 20-21. She is limited to what she raised in opposition. First, regarding sick leave, the record does not reflect that Wilmoth was denied the ability to take paid leave; rather, she was told she had used up all her sick days and that further days would be unpaid. Wilmoth Dep. 195:4-16. Accordingly, this does not constitute adverse employment action. *See King v. City of Philadelphia*, No. 99-6303, 2002 WL 1277329, at *15 (E.D. Pa. June 4, 2002).

With respect to selective enforcement of the lateness policy, the parties do not dispute that Wilmoth received multiple written late notices.  Defs. Facts ¶¶ 45-51.  However, Wilmoth attributes the late warnings to her internal complaints of Cianflone's alleged sexual harassment and her EEOC complaint.  Pl. Facts ¶ 47.  Since at least one of the late notices included a threat of termination, Ex. G to Kneisser Cert., the warnings can be considered "materially adverse" to a reasonable person, because "if the action taken by [Relocation Express] would tend to dissuade a reasonable employee from engaging in future protected action, it would suffice to form the adverse action requirement of [Wilmoth's] prima facie case of retaliation against [Relocation Express]." *Rivers v. Potter*, No. 05-4868, 2007 WL 4440880, at *9 (D.N.J. Dec. 18, 2007).  The record therefore sufficiently evidences selective enforcement as an adverse employment action.

As to the third prong, causation, "at the prima facie stage, the plaintiff may rely on a broad array of evidence to demonstrate a causal link between the protected activity." *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 657 (E.D. Pa. 2021).  "For example, the plaintiff may produce evidence of temporal proximity between the adverse action and protective activity, or the plaintiff may rely on evidence of 'intervening antagonism' to support the interference of retaliatory animus."  *Id.* at 658 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007)).  Though temporal proximity is not "legally conclusive proof against retaliation," it can be "unusually suggestive of a retaliatory motive." *Id.* at 655-57.  Here, Wilmoth complained about the alleged sexual harassment to Essex in December 2018 and to Defendant Silvestri in January 2019.  Defs. Facts ¶¶ 12, 31.  She complained again to Defendant Silvestri in March 2019.  Ex. E to Kneisser Cert.  The record shows written notices dated April through July 2019.  Exs. F-H to Kneisser Cert.  This temporal proximity is enough to demonstrate causation at the prima facie stage.

However, upon a showing of a prima facie case of retaliation, the "burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason" for the action.  *Branch*, 554 F. Supp. 3d at 657.  Defendants do so, by pointing to Wilmoth's job performance and highlighting Wilmoth's acknowledgement of her lateness issues.  Br. at 16; *see also* Defs. Facts ¶ 45.

"After the defendant provides a legitimate, non-retaliatory reason for its conduct, the burden shifts back to the plaintiff to convince the factfinder that the employer's proffered reasons were pretext and that retaliation was the real reason for the adverse employment action."  *Branch*, 554 F. Supp. 3d at 657 (citing *Moore*, 461 F.3d at 341).  "The plaintiff must convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Id.* (cleaned up).  At the pretext stage, to prove causation, the plaintiff must show that she would not have suffered adverse employment action "but for" the protected activity.  *Id.* at 658.  Other than the aforementioned evidence regarding the timing of Wilmoth's complaints and the adverse employment action, Wilmoth only notes that one other employee was always late but never disciplined.  Pl. Supp. Facts ¶ 80.  "Even assuming their conduct is comparable," Wilmoth provides no concrete evidence that this individual "had [a] disciplinary record[] similar to hers."  *Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90, 99 (3d Cir. 2016).  These general allegations are "insufficient to cast doubt on [Relocation Express's] reason" for her lateness discipline.  *Id.*  Accordingly, the Court will **DISMISS** Wilmoth's retaliation claim.

### D.      The Record Does Not Support Wilmoth's Aiding and Abetting Claim

"Under the NJLAD it is unlawful for any person, even if not an employer under the NJLAD definition, 'to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the LAD] ....'"  *Michalak v. ServPro Indus., Inc*., No. 18-1727, 2019 WL 3562690, at *5 (D.N.J. Aug.

22

6, 2019) (quoting N.J.S.A. 10:5-12(e)).  "An individual or entity aids or abets an act forbidden under the NJLAD when knowingly giving substantial assistance to the principal violator."  *Id.* (citing *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004)).  "The test for substantial assistance requires the Court to consider five facts: (1) the nature of the act encouraged; (2) the amount of assistance given by the [abettor]; (3) whether the [abettor] was present at the time of the asserted harassment; (4) the [abettor's] relations to the others; and (5) the state of mind of the [abettor]. . . Further, in the context of failure to act, [individual liability] 'requires active and purposeful conduct."  *Id.* (cleaned up).

As a threshold matter, "[t]he NJLAD does not provide for individual liability for aiding and abetting if the employer is not found liable."  *Tourtellotte*, 636 F. App'x at 856.  The Court found the record did not support Wilmoth's retaliation claim, but that Wilmoth established a case for hostile work environment against Relocation Express.  Accordingly, that is the only "violation[] that can form the basis of an aiding and abetting claim" against Defendant Silvestri.  *Williams*, 2020 WL 7391009, at *20.

### 1.  Defendant Silvestri

"There are two forms of aiding and abetting under NJLAD: an active form and a passive form."  *Prioli v. Cnty. of Ocean*, No. 18-256, 2021 WL 4473159, at *23 (D.N.J. Sept. 30, 2021) (cleaned up).  "To establish the active form, three elements must be proven: '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'"  *Id.* (internal citation omitted).  Nothing in the record demonstrates that Defendant Silvestri knowingly assisted Cianflone in the alleged harassment.  Instead, Wilmoth relies on the

passive form of aiding and abetting, which requires her to establish that "the supervisor holds a duty to act against harassment and yet remains deliberately indifferent to its existence." *Id.* at *24 (cleaned up).

Individuals and an employer need not share the same discriminatory intent to find aiding and abetting liability; rather, a supervisor has a duty to act against harassment, which "can be violated by deliberate indifference or affirmatively harassing acts." *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999). "'Inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement.'" *Id.* (quoting *Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir. 1998)).

The parties do not dispute that Defendant Silvestri became aware of the alleged harassment in January 2019. Defs. Facts ¶ 33. The parties also do not dispute that Defendant Silvestri escalated the allegations to Langley, discussed them with Wilmoth, and advised Cianflone that he could not be alone with Wilmoth or communicate with her on a personal basis. *Id.* ¶¶ 34-36. Wilmoth stopped reporting to Cianflone after she reported the alleged harassment. Wilmoth Dep. 188:18-24; Silvestri Dep. 47:12-13. Wilmoth also does not dispute that she told Defendant Silvestri she did not want Cianflone out of the office completely. Defs. Facts ¶ 37.

However, Cianflone continued to work at Relocation Express, and the parties dispute whether harassment continued. Defendants state that Cianflone stopped sexually harassing Wilmoth, touching her, and making inappropriate comments to her, *id.* ¶ 38 (citing Wilmoth Dep. 185:8-24), and calls made by Cianflone to Wilmoth after the reporting did not rise to the level of harassment. *Id.* ¶ 40. Wilmoth states the harassment continued, as Cianflone constantly hovered over Wilmoth, called her, and told her he was watching her. Pl. Facts ¶ 38 (citing Wilmoth Dep.

186:12-20).  As such, Wilmoth's argument that Defendant Silvestri failed to take *any* remedial action is not quite accurate, Opp'n at 25; rather, she contests the action's adequacy.

Instances of action can be very overt.  *See, e.g.*, *Hurley*, 174 F.3d at 128 ("Rifice testified that he did nothing to stop the harassment because the harassers should already have known better and he did not believe that he could do anything about it.").  The record reflects that Defendant Silvestri did take some action.  For purposes of this motion, what matters is whether that action was so deficient that it "rises to the level of providing substantial assistance or encouragement." *Failla*, 146 F.3d at 158 n.11.  No reasonable jury can find as much.  Accordingly, the Court will **DISMISS** the aiding and abetting claim.[11]

## V.      CONCLUSION

For the reasons above, Defendants' summary judgment, D.E. 97, is **GRANTED in part** and **DENIED in part**.  Counts I, II, IV, and V will be **DISMISSED** and Count III will **PROCEED** against Defendant Relocation Express.

Dated: July 17, 2024

Evelyn Padin, U.S.D.J.

---

[11] The Court therefore need not address whether corporate defendants may be liable for aiding and abetting.